JULIE O'STEEN and CHRISTOPHER
O'STEEN,

        **Plaintiffs,**

v.                                                   Case No:   6:17-cv-849-Orl-31KRS

**WELLS FARGO BANK, N.A., WELLS
FARGO HOME MORTGAGE, INC. and
RUSHMORE LOAN MANAGEMENT
SERVICES, LLC,**

        **Defendants.**

## ORDER

This matter comes before the Court, without a hearing, on the Motion for Summary Judgment (Doc. 83) filed by the Defendant, Rushmore Loan Management Services, LLC ("Rushmore"); the Motion for Summary Judgment (Doc. 87) filed by the Defendants, Wells Fargo Bank, N.A.("Wells Fargo") and Wells Fargo Home Mortgage, Inc. ("WFHM"); the Plaintiffs' Response in Opposition (Doc. 96); Rushmore's Reply thereto (Doc. 99); and Wells Fargo and WFHM's Reply thereto (Doc. 100).

**I. Background**

    **A. Summary of the Facts**

On April 5, 2005, Julie O'Steen executed a Note in the amount of $82,400 with Wells Fargo Home Mortgage, Inc. ("WFHM"), secured by a mortgage which was contemporaneously executed by both Julie O'Steen and her spouse, Christopher O'Steen. Penno Decl., Doc. 84-1

at 1.[1] On December 3, 2012, following the Plaintiffs' default on the mortgage, Wells Fargo initiated a foreclosure action. Mortgage Foreclosure Complaint, Doc. 85-2 at 2-4. Also in December of 2012, the Plaintiffs sent Wells Fargo a loss mitigation application in which they asked for loan forbearance due to unemployment. Wells Fargo Mot. at 3-4. Wells Fargo offered the Plaintiffs a six-month forbearance in January of 2013. On January 9, 2014, the state court entered a final summary judgment in favor of Wells Fargo and against the Plaintiffs. *See* Final Summary Judgment of Mortgage Foreclosure, Doc. 85-3 at 2-6. Between the months of January and September, 2014, the sale of the property was rescheduled three different times; eventually, the state court entered an order on September 30, 2014, scheduling the sale on January 7, 2015. *See* Order Rescheduling Foreclosure Sale, Doc. 85-6 at 2-3.

On October 23, 2014, Wells Fargo sent Julie O'Steen[2] a Trial Period Plan ("TPP") Notice, explaining that it had approved her for a trial payment plan that required her to make three monthly payments of $1,042.19. TPP Notice, Doc. 84-1 at 28. The Notice provided that Julie O'Steen "may eligible for a modification," and that the TPP was "the first step toward qualifying for more affordable mortgage payments." *Id.* The TPP Notice instructed that, in order "[t]o accept this offer," she should either call Wells Fargo at the number listed or send in her "Trial Period payment" rather than her "normal mortgage payment" within fifteen days of the date on the letter. *Id.* The Notice indicated that the TPP could extend beyond three months, and that the mortgage could only be modified after Wells Fargo determined that all Trial Period payments were timely

---

[1] On May 8, 2004, WFHM "was acquired by and merged into Wells Fargo." Penno Decl., Doc. 84-1 at 1. Because the evidence that Wells Fargo acquired WFHM is undisputed, the Court hereinafter refers to the two collectively as "Wells Fargo," even though the language in the letters refers to "Wells Fargo Home Mortgage."

[2] Although the evidence shows that both Julie and Christopher O'Steen were obligors on the Mortgage, Wells Fargo's letters were addressed to Julie O'Steen individually.

made and that she "submitted all the required documents, including title clearance requirements." *Id.* Additionally, the Notice stated that no foreclosure sale would be held during the TPP, so long as she complied with its terms. *Id.* at 29.

Eight days later, Wells Fargo sent Julie O'Steen a letter providing that it was "unable to complete the final modification of [her] loan until the title issue(s)" on the property were resolved. Letter of October 31, 2014, Doc. 84-1 at 40. Included with the letter were a list of required documents for her to send to Wells Fargo within thirty business days and an attached title report, which listed various judgments in addition to mortgages and which read "NO TITLE ISSUES" on one of its pages. *Id.* at 40-49. The Plaintiffs made the December 1, 2014; January 1, 2015; and February 1, 2015 payments under the Trial Period Plan. O'Steen Decl., Doc. 95-1 at 3.[3]

Shortly after the Plaintiffs' February TPP payment, Wells Fargo sent Julie O'Steen a second letter explaining that it needed additional documents in order to complete modification of the loan. Letter of February 3, 2015, Doc. 84-1 at 53-55. The following month, Wells Fargo sent Julie O'Steen a third letter stating that, in order to proceed with loan modification, she would need to "provide documented proof that the title issue(s) has been resolved," within ten business days of her receipt of the letter, or Wells Fargo would deny the loan modification request. Letter of March 23, 2015, Doc. 84-1 at 72.

Thirty-nine days later, Wells Fargo sent Julie O'Steen a final letter providing that, due to title issues, she did not meet the requirements for the loan modification program. Letter of May 1, 2015, Doc. 84-1 at 75. The final letter also stated that she had the right to submit a request to dispute the decision, if she believed it was "incorrect." *Id.* Also on May 1, 2015, Christopher

---

[3] In December of 2014, the Plaintiffs successfully moved to cancel the foreclosure sale that had been scheduled for January 5, 2015.

O'Steen filed a bankruptcy petition in order "to obtain a judicial declaration that judgments against him would not affect title." Pl.'s Resp. at 14. On May 29, 2015, the Plaintiffs faxed Wells Fargo a Dispute Request Form in order to dispute Wells Fargo's decision. Pl.'s Resp. at 3. Dispute Request Form, Doc. 95-2 at 1. According to the Plaintiffs, they continued to make the Trial Period Plan payments through February 2016, although Wells Fargo apparently rejected the January and February 2016 payments. Pl.'s Resp. at 3.

Rushmore apparently became the loan servicer for the mortgage on April 5, 2016. Rushmore sent letters soliciting loss mitigation information on July 11, 2016; August 13, 2016; September 17, 2016; October 20, 2016; and December 1, 2016. Rushmore Mot. at 4. On May 23, 2016, Wells Fargo moved to reset the foreclosure sale. Mot. to Reset Foreclosure Sale, Doc. 81-6 at 2-3. The property was sold to a third party at a foreclosure auction on March 1, 2017. *See* Homeowner's Obj. to Sale, Doc. 81-8 at 2. The Plaintiffs' objection to the sale was denied. Order Denying Obj. of Sale, Doc. 81-9 at 2.

**B. Procedural History**

On October 24, 2016, the Plaintiffs filed their Original Complaint (Doc. 1) in the Tampa Division of the United States District Court for the Middle District of Florida. The Original Complaint was dismissed with leave to amend on December 27, 2016. Doc. 21. On January 17, 2017, the Plaintiffs filed an Amended Complaint (Doc. 24), which was dismissed in part with leave to amend. Doc. 42. On March 15, 2017, the Plaintiffs filed their Second Amended Complaint (Doc. 43), alleging six counts: Count I alleges breach of contract by Wells Fargo; Count II alleges breach of contract by Rushmore; Count III alleges violation of Regulation X, 12 C.F.R. § 1024.41(d) by Wells Fargo; Count IV alleges violation of Regulation X, 12 C.F.R. § 1024.41(g) by Wells Fargo; Count V alleges violation of Regulation X, 12 C.F.R. § 1024.41(g)

by Rushmore; and Count VI seeks declaratory relief against Rushmore. On May 12, 2017, this case was transferred from the Tampa Division to the Orlando Division. Doc. 72. On June 21, 2017, both Rushmore and Wells Fargo filed their Motions for Summary Judgment (Docs. 83, 87). On July 25, 2017, the Plaintiffs filed their Response (Doc. 96), and thereafter Rushmore and Wells Fargo filed Replies (Docs. 99, 100).

**II. Standard of Review**

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact and that movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the nonmoving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

**III. Breach of Contract: Counts I and II**

    **A. Legal Standard**

Under Florida law, to prevail on a breach of contract claim, plaintiff must establish "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*, 857 F. Supp. 2d 1294, 1301 (S.D. Fla. 2012) (quoting *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009)). A contract is not enforceable unless "'there has actually been a meeting of the minds of the parties upon definite terms and conditions which include the essential elements of a valid contract.'" *Leopold v. Kimball Hill Homes Fla., Inc.*, 842 So.2d 133, 136 (Fla. 2d DCA 2003) (quoting *Mehler v. Huston*, 57 So. 2d 836, 837 (Fla. 1952)). To prove the existence of a contract, a plaintiff must show: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms. *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *St. Joe Corp. v. McIver,* 875 So.2d 375, 381 (Fla. 2004); *see also W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.,* 728 So.2d 297, 302 (Fla. 1st DCA 1999). "An essential, or material, term is '[a] contractual provision dealing with a significant issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done.'" *United States Doe v. Health First, Inc.*, 2017 WL 1929700, at *4 (M.D. Fla. 2017) (quoting *Material Term*, BLACK'S LAW DICTIONARY (9th ed. 2009)).

    **B. Analysis**

The Plaintiffs allege that the TPP Notice "constituted a valid offer" and that they "accepted it by making trial period payments." Pl.'s Resp. at 7. They argue that the higher TPP payments[4]

---

    [4] Wells Fargo maintains that there was no consideration for the alleged contract because "the [l]oan already required Plaintiffs to make monthly payments that were greater than those required by the Trial Period Plan." Wells Fargo Mot. at 10. The Fixed Rate Note, however, shows

- 6 -

and the obligations to provide additional documentation and subrogation agreements, to pay off judgments and liens, to pay escrow, and to certify the accuracy of the financial information they provided constituted valid consideration. *Id.* at 8-9.

The Plaintiffs argue not only that the TPP was a contract, but that the failure to provide permanent loan modification was a breach of its terms. However, any permanent loan modification was far from guaranteed. The TPP Notice clearly contemplated the possibility that Julie O'Steen might not even be eligible for a loan modification, allowing only that Julie O'Steen "may be eligible for a modification." TPP Notice, Doc. 84-1 at 28. It further cautioned that the "mortgage may only be modified after we determine all your trial period payments were made on time and you submitted all the required documents, including any title clearance requirements." *Id.* Giving no definite end point for the TPP, it instructs Julie O'Steen to "continue making your trial period payments . . . until your home preservation specialist advises that you may move forward with a final modification or that you are no longer eligible for a modification." *Id.* There could be no modification until a loan modification agreement was signed by both parties. *Id.* at 33.

Fatally, the TPP Notice is devoid of any reference to what the terms of any potential loan modification agreement might be. There is no concrete information as to when the loan modification would actually occur, or what the payments, escrow, principal balance, and interest rate would be under the modified loan agreement. The Plaintiffs argue that the "new loan amount" could easily be calculated by multiplying the TPP payment by 480 months. Pl.'s Resp. at 9. However, the 480-month term mentioned in the Notice did not refer to the TPP, but to a yet to be determined permanent loan modification.

---

a payment smaller than the one required under the TPP. *Compare* Fixed Rate Note, Doc. 84-1 at 5 *with* TPP Notice, Doc. 84-1 at 28. Wells Fargo does not state the total amount of the monthly payment to which it refers.

The terms of any potential loan modification were indefinite and uncertain and, thus, they could not possibly be enforced. *See Senter v. JPMorgan Chase Bank*, *N.A.*, 810 F. Supp. 2d 1339, 1351 (S.D. Fla. 2011) ("Since the TPP Agreements are indefinite and uncertain as to material terms of the permanent loan modifications, such agreements represent, at best, unenforceable agreements to agree that do not rise to the level of a valid contract."). Without sufficient specification of the essential terms, there can be no contract. Consequently, the Plaintiffs cannot survive summary judgment on their breach of contract claims. Wells Fargo's Motion is **GRANTED** as to Count I and Rushmore's Motion is **GRANTED** as to Count II.

**IV. RESPA and Regulation X: Counts III, IV, and V**

  **A. Legal Standard**

"RESPA is a consumer protection statute that regulates the real estate settlement process." *Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006). "RESPA prescribes certain actions to be followed by entities or persons responsible for servicing federally related loans, including responding to borrower inquiries." *McLean v. GMAC Morg., Corp.*, 398 Fed. App'x 467, 471 (11th Cir. 2010); *see* 12 U.S.C. § 2605. On January 10, 2014, new regulations implementing RESPA were promulgated by the Consumer Financial Protection Bureau pursuant to the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd–Frank"). PL 111-203, July 21, 2010, 124 Stat. 1376 (2010); 12 C.F.R. § 1024. This new regulation, Regulation X, sets out the duties that arise for loan servicers upon their receipt of loss mitigation applications. Section 1024.41 regulates the particular loss mitigation procedures at issue here.

Specifically, the Plaintiffs allege violations of § 1024.41(d) and (g).[5] Section 1024.41(d) requires a servicer denying a borrower's complete mitigation loss application[6] for loan modification to provide the borrower with a notice stating the specific reasons for the servicer's decision. Section 1024.41(g) prohibits foreclosure under certain circumstances after a borrower submits a complete loss mitigation application to a servicer.

**B. Analysis**

**1. Count III: Violation of § 1024.41(d)**

The Plaintiffs assert that Wells Fargo violated § 1024.41(d) because it "fail[ed] to give notice of actual reasons for denial of the loan modification." Pl.'s Resp. at 17. Wells Fargo argues that its obligations under Subsection (d) "were not triggered," because loan modification was not a loss mitigation option "available to [the Plaintiffs]." Wells Fargo Mot. at 16. This argument does not hold water. Wells Fargo's own letter to Julie O'Steen warned that "failure to return the requested documents within the stated timeframe may result in your modification being denied." Letter of Oct. 31, 2014, Doc. 84-1 at 40. If § 1024.41(d) truly permitted the interpretation Wells Fargo proposes, its goals would be severely compromised. Either a borrower qualifies for loan modification, or she does not. Servicers cannot avoid liability under the regulation by simply stating that a loss mitigation option is "unavailable" instead of denying the loss mitigation application for that particular option.

---

[5] Although it might be possible for other subsections, such as § 1024.41(h), to apply here, the Court does not address potential violations of any other subsection, because the Plaintiffs only pled violations of § 1024.41(d) and (g).

[6] Notwithstanding the fact that Wells Fargo continued to ask for information from the Plaintiffs in connection with their loss mitigation application, Wells Fargo concedes that the Plaintiffs submitted a complete loss mitigation application to Wells Fargo in October of 2014. *See* Wells Fargo Mot. at 4.

Importantly, although Wells Fargo's denial of the loan modification did trigger duties under § 1024.41(d), Wells Fargo fulfilled those duties. In its final letter, Wells Fargo specifically stated that Julie O'Steen did not meet the requirements of the loan modification program because of title issues with the subject property. Letter of May 1, 2015, Doc. 84-1 at 75. Wells Fargo had also sent the Plaintiffs three previous letters, as detailed above, explaining that title issues were preventing them from modifying the Plaintiffs' loan. Further, it appears from the Plaintiffs' Response that they knew exactly why their loan modification was denied, because Christopher O'Steen took "the extreme step of filing a bankruptcy petition . . . to obtain a judicial declaration that judgments . . . would not affect title [of the property]." Pl.'s Resp. at 14. The Plaintiffs' disagreement with the specific reason provided by Wells Fargo is irrelevant. The evidence conclusively shows that Wells Fargo did state the specific reason for its determination in its final letter, the Plaintiffs were well aware of that reason, and accordingly, it is clear that Wells Fargo did not violate § 1024.41(d). Wells Fargo's Motion is **GRANTED** as to Count III.

2. **Counts IV and V: Violation of § 1024.41(g)**

The Plaintiffs allege that Wells Fargo and, potentially, Rushmore, as its successor servicer, violated § 1024.41(g) "by proceeding to a foreclosure sale when a pending loss mitigation application was not yet resolved." Pl.'s Resp. at 20, 24. Wells Fargo argues that its actions were permissible under the Subsection (g), which prohibits a servicer from "mov[ing] for foreclosure judgment or order of sale, or conduct[ing] a foreclosure sale," subject to certain exceptions.[7]

---

[7] The prohibition does not apply if : "(1) The servicer has sent the borrower a notice . . . that the borrower is not eligible for any loss mitigation option and the appeal process . . . is not applicable, the borrower has not requested an appeal within the applicable time period for requesting an appeal, or the borrower's appeal has been denied; (2) The borrower rejects all loss mitigation options offered by the servicer; or (3) The borrower fails to perform under an agreement on a loss mitigation option." § 1024.41(g).

Wells Fargo Mot. at 19-20; § 1024.41(g). Wells Fargo maintains that it did not violate the regulation by moving for an order of sale, because an order had already been entered prior to its receipt of the Plaintiffs' complete loss mitigation application. Additionally, Wells Fargo points out that the foreclosure sale was not conducted until March 1, 2017, which was a year after Wells Fargo stopped servicing the Plaintiffs' loan, and nearly two years after Wells Fargo denied the Plaintiff's loan modification application. Rushmore argues that it is not liable under Subsection (g) because the Plaintiffs never submitted a loss mitigation application to Rushmore, and asserts that there was no pending loss mitigation application when it began servicing the loan. Rushmore Mot. at 9-11.

In order to ascertain whether Wells Fargo or Rushmore's actions violated § 1024.41(g), it is necessary to determine whether (1) either of the Defendants moved for an order of sale, or conducted a foreclosure sale, and (2) either of the Defendants did so while an appeal by the Plaintiffs was pending. It is unclear what roles Rushmore and Wells Fargo played with respect to the ultimate foreclosure sale. It appears that Rushmore was the Plaintiffs' loan servicer during the time leading up to foreclosure. Still, Wells Fargo moved to reset the foreclosure sale on May 23, 2016, after it alleges it was no longer servicing the Plaintiffs' loan.[8] The evidence is also inconclusive as to whether the Plaintiffs "appealed" the loan modification denial for purposes of Subsection (g), and, if they did, whether Wells Fargo or Rushmore denied that appeal. While the Plaintiffs faxed Wells Fargo a Dispute Request Form, there is some question as to whether this constituted an appeal. A review of the Dispute Request Form reveals that rather than actually disputing Wells Fargo's basis for the decision—that the Plaintiffs had failed to submit the required

---

[8] The Plaintiffs contend that making this motion constituted moving for an order of sale within the meaning of Subsection (g).

documentation—the Plaintiffs were asking Wells Fargo to allow the TPP "to continue until Chapter 7 bankruptcy is complete and judgments are discharged and released." *See* Dispute Request Form, Doc. 95-2 at 1.

Thus, genuine disputes of material facts persist as to whether Wells Fargo or Rushmore violated Subsection (g) by pursuing the foreclosure sale without first resolving any pending appeal. Accordingly, Wells Fargo's Motion is **DENIED** as to Count IV and Rushmore's Motion is **DENIED** as to Count V.

## V. Declaratory Relief: Count VI

In Count VI, Plaintiffs seek equitable relief in the form of a declaratory judgment against Rushmore under 28 U.S.C. § 2201. The Plaintiffs allege that they are in doubt of the rights and responsibilities of the parties with respect to the trial payment plan, permanent loan modification, the foreclosure sale of the subject property, and § 1024.41(g). Rushmore moves for summary judgment on Count VI on the basis of what is essentially a mootness argument, arguing that no uncertainty remains as to the rights and responsibilities of Rushmore and the Plaintiffs. However, since Rushmore has not prevailed on the § 1024.41(g) RESPA claim, this count is not technically moot. Rushmore's Motion is therefore **DENIED** as to Count VI. Nevertheless, the Court is doubtful that declaratory relief will be appropriate in resolving this case.[9]

## VI. Conclusion

In consideration of the foregoing, it is hereby

**ORDERED** that the Defendants' Motions for Summary Judgment (Docs. 83, 87) are **GRANTED IN PART AND DENIED IN PART**. Judgment in favor of Wells Fargo as to Counts

---

[9] A declaratory judgment is an equitable remedy within the Court's discretion. Resolution of the RESPA claim should resolve any legal issue such that a declaratory judgment will be unnecessary.

I and III shall be entered, and judgment in favor of Rushmore as to Count II shall be entered. The Defendants' Motions for Summary Judgment are **DENIED** in all other respects.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on September 25, 2017.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party